# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIE A. MITCHELL,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:14-cv-00238-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff Christie A. Mitchell, by her attorney, Jacqueline Anna Forslund, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge.

Plaintiff contends that the Administrative Law Judge ("ALJ") failed to give legally adequate reasons for rejecting (1) the examining psychologist's opinion and (2) the statement of Plaintiff's daughter. Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

///

///

I.  **Procedural History**

On May 27, 2005, Plaintiff applied for supplemental security income, alleging disability beginning June 1, 1986. The Commissioner initially denied the claim on October 26, 2005, and upon reconsideration, on March 6, 2007. Following a hearing on March 19, 2008, the ALJ denied the application.[1]

On March 1, 2010, Plaintiff again applied for supplemental security income, alleging disability beginning April 22, 2008. The Commissioner initially denied the claim on October 18, 2010, and upon reconsideration, on March 10, 2011. On May 9, 2011, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on May 14, 2012. Jose L. Chaparro, an impartial vocational expert, also appeared and testified.

On May 22, 2012, Administrative Law Judge Michael J. Haubner denied Plaintiff's application. The Appeals Council denied review on December 20, 2013. On February 20, 2014, Plaintiff filed a complaint seeking this Court's review.

II. **Factual Background**

Plaintiff (born December 18, 1948) testified that she last worked, off-the-books, as a babysitter in the 1980's. (In her adult disability report, Plaintiff reported that she stopped working when she married in 1972.) Plaintiff is a high school graduate. She does not have a driver's license.

Plaintiff estimated that she could easily walk for two hours at a time. She could stand for about thirty minutes at a time and sit for twenty minutes. The most she could carry was twenty pounds. Generally, she needed to rest about one hour in an eight-hour day. She could pay attention for about twenty minutes at a time.

Plaintiff shared a single-family home with her elderly mother, her younger brother, and a second brother and his wife. Plaintiff cared for two cats and three dogs. She cooked once or twice a day, cleaned up afterward, and took out the trash. She swept inside and outside, and mopped the floors, but did not vacuum. She did laundry daily. Plaintiff did daily yard work, including watering and weeding, but did not mow the grass. She shopped daily. Although Plaintiff helped her

---

[1] Plaintiff had also been denied disability benefits in 1992 and 1997.

bedridden mother to perform her personal needs, she testified that her health would not allow her to take care of a sick person as a full-time job.

Plaintiff visited her adult daughter once or twice a month. She enjoyed writing letters and watching television. She was able to dress herself and perform her own personal care.

In an adult function report dated June 15, 2010,[2] Plaintiff denied that she cared for any other family members, including parents. She claimed difficulty dressing herself, particularly managing pants, long sleeves, and socks. She was able to prepare her own meals, and to do light housework and yard work.

Plaintiff went outside daily, walking, riding in a car, or using public transportation. She stopped driving after seven accidents. Her condition limited lifting, squatting, bending, reaching, kneeling, hearing, seeing, completing tasks, concentrating, understanding, following instructions, using hands, and getting along with others. She complained of leg, foot, and ear pain, swelling of her extremities, and difficulty chewing. (She reported that she had no teeth.) She needed glasses, hearing aids, and a cane. From 2008 to 2009, Plaintiff lost 145 pounds.

Plaintiff's daughter, Andrea Pritchett, completed a third-party adult function report dated June 15, 2010. Ms. Pritchett dismissed her mother's cooking and cleaning abilities, reporting that she took too long and failed to do an adequate job. Plaintiff, she said, annoyed neighbors and local school personnel by talking nonsense and making unwanted telephone calls. When Plaintiff lived with Ms. Pritchett and her family, they were forced to take out their phone to end her habit of making annoying phone calls to others. For example, Plaintiff repeatedly called the local school nurse to complain about her illnesses. Plaintiff could dress herself but lacked a sense of personal modesty, going outside to talk to people without pants or in her pajamas.

According to Ms. Pritchett, Plaintiff no longer shopped because she talked to those she encountered about private family matters and came home with items that she should not have purchased. She had difficulty following written and spoken instructions. Never having worked, Plaintiff lacked the ability to budget or handle money: when Ms. Pritchett was a child, her

///

---

[2] Because Plaintiff went over her handwriting multiple times, the adult function report is difficult to read.

3

grandmother supplemented Plaintiff's welfare check and paid Plaintiff's bills for her. Plaintiff enjoyed watching children's television programs and writing words.

Ms. Pritchett opined that, although Plaintiff shook and had difficulty squatting and bending, "mostly it's mental." AR 195. She needed glasses and diabetic supplies. Plaintiff, said Ms. Pritchett, is a hypochondriac who would feign sickness to avoid stress or an unfamiliar situation. Plaintiff also sees and hears things that are not there, and claims to care for ten or twelve grandchildren, although she has only two teen-aged grandchildren. Similarly, Plaintiff claimed to have had multiple traffic accidents but was actually only in one accident--when she was sixteen years old and her mother was driving.

**Medical records.** Plaintiff received regular physical medical care at University Health Services on April 3, June 25, July 18, and November 10, 2008; and February 3, June 30, and December 2, 2009. Her diagnoses reflected high blood pressure and diabetes mellitus. Plaintiff's blood sugar ranged from 80 to 108 mg/dL: her physicians attempted to adjust her Metformin[3] to achieve a consistent normal level. Her blood pressure was generally elevated. Her doctors encouraged a low salt diet and exercise.

Despite Plaintiff's representation of substantial weight loss in this time period, the notes show that Plaintiff's weight varied within a range of 153.7 to 184 pounds. Plaintiff was about five feet one inch tall. The UHS records reflect diagnoses of bipolar disorder and schizophrenia, and referrals to Fresno County Behavioral Services. Plaintiff stopped taking her prescriptions, Metformin and thioridazine (Mellaril),[4] on multiple occasions.

On July 18, 2010, internist Robert Wagner, M.D., prepared a consultative internal medicine evaluation for the agency. Plaintiff told Dr. Wagner that because she had weighed 338 pounds six months to one year before, but now weighed 150 pounds, she no longer needed any medication. Dr. Wagner noted that no documentation supported her claim. Plaintiff also told him that her left knee "gave out" occasionally, but that she could walk long distances at other times and that she had no significant pain. The doctor observed, "She may not be a very reliable historian per review of

---

[3] Metformin is used alone or with other medications to treat Type 2 diabetes. www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (April 8, 2015).
[4] Mellaril (Thioridazine) is an antipsychotic drug used to treat schizophrenia. www.nlm.nih.gov/medlineplus/druginfo/meds/a682119.html (April 8, 2015).

4

records." AR 250. Although Dr. Wagner deferred evaluation of her mental health to psychiatry, he noted:

> The client has bright affect, however, she presents speaking very rapidly, often going off topic and very hard to direct back into the topic at hand. She did mention coming into the examination that she has multiple 15-year-old daughters who keep her very busy, a statement that is not true per the records I reviewed. The claimant was pleasant to talk with.

AR 250.

Plaintiff was able to rise from her waiting room chair and walk to the examining room without assistance, easily get on and off the examining table, and put on her own shoes and socks. Dr. Wagner opined that Plaintiff had no limitations in sitting, standing, walking, or manipulation. She could lift and carry fifty pounds occasionally and 25 pounds frequently. Because "she may not apprehend dangers normally," she should not climb or balance. AR 253.

On July 23, 2010, psychologist Gerardine Gauch, Psy.D., prepared a consultative psychiatric evaluation for the agency. Dr. Gauch reviewed no medical records, relying solely on Plaintiff's representations.

According to Plaintiff, her chief psychological complaint was withdrawing into herself and isolating socially:

> The claimant is seeking SSI benefits because "I pulled into myself and I don't talk to anymore [*sic*]. I've had multiple motor vehicle accidents and injury to my left side." She stated, "I've been going to mental health since 1986 because of an abusive marriage.["] She stated that she also has a cast on her leg since an automobile accident in 1964 at age 16. She also has hearing problems, she is deaf in one ear and her right ear is now sore.

AR 254.

Her current medications were Lexapro,[5] Lipitor,[6] Enalapril,[7] Hydrochlorothiazide,[8] aspirin,

---

[5] Lexapro is used to treat depression and generalized anxiety disorder. www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (April 8, 2015).

[6] Lipitor (atorvastatin) is prescribed with diet, weight loss, and exercise to reduce the risk of heart disease by decreasing the amount of fatty substances in the blood. www.nlm.nih.gov/medlineplus/druginfo/meds/a600045.html (April 8, 2015).

5

Phemfilcon,[9] and, in the old days, Dibenzyline.[10] Plaintiff had a long history of psychiatric treatment and took Mellaril for many years. Plaintiff told Dr. Gauch that she had never been hospitalized nor attempted suicide, and that she had recently lost 180 pounds.

Plaintiff came to the appointment dressed in a shirt, jeans, and bedroom slippers. Although she displayed adequate hygiene, her hair was carelessly drawn to the side using a plastic clip. Her purse retained its paper tag. She had good eye contact, used appropriate expressions, and was cooperative and pleasant.

Plaintiff's speech was logical, coherent, and concise. Her stream of thought was within normal limits without indication of hallucinations or delusions. Intellectual functioning appeared normal. Her memory was adequate. Speech was clear and of normal volume, but rapid. Plaintiff had sufficient concentration for conversation.

Plaintiff's abstract thinking was limited. For example, when asked the meaning of the proverb "People who live in glass houses shouldn't throw stones," Plaintiff stated:

> For one thing glass is expensive, for another thing I wouldn't live in a glass house if they gave it to me because they hurt people[s'] feelings and they are breaking things, see that is what my husband does, he lives in a glass house and he is constantly throwing stones, that would be the best way to describe my ex-husband, he lives in a glass house because he thinks he is above everybody and he is a restless spirit, he is constantly moving. I try to be calm and be with family. I do know that he loves to travel and I don't, after that accident and several more after that, you would want me to stay off the road.

AR 257.

Dr. Gauch diagnosed:

Axis I:   296.9 Mood disorder not otherwise specified.
Axis II:  799.9 Deferred

---

[7] Enalapril, an ACE inhibitor, is used with hydrochlorothiazide to reduce high blood pressure. www.nlm.nih.gov/medlineplus/druginfo/meds/a601047.html (April 8, 2015).
[8] Hydrochlorothiazide is used alone, or in combination with other medications, to treat high blood pressure. It is a diuretic that treats edema caused by other medications. www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (April 8, 2015).
[9] Phemfilcon is a material used in the manufacture of certain soft contact lenses. www.ncbi.nlm.nih.gov/pubmed/15017179 (April 8, 2015).
[10] Dibenzaline (Phenoxybenzamine) is used to treat high blood pressure. www.nlm.nih.gov/medlineplus/druginfo/meds/a682059.html (April 8, 2015).

|  |  |
|---|---|
| Axis III: | Status-post hysterectomy, diabetes type II |
| Axis IV: | Unemployed, financial stressors |
| Axis V: | Current GAF 55 |

AR 258.

The doctor noted that Plaintiff's symptoms and mood disorder were mild, and that there was fair likelihood of improvement within twelve months. She opined that Plaintiff had good ability to understand and remember very short and detailed instructions, and to interact with co-workers; fair ability to understand and remember detailed instructions, to maintain concentration and attention, to accept instructions from a supervisor and respond appropriately, and to deal with changes in the work setting; and poor ability to sustain an ordinary routine without special supervision, and to complete a normal workday and work week without interruptions influenced by her mood disorder. Because of her mood disorder, Plaintiff also had fair likelihood of emotionally deteriorating in the workplace. She was not capable of managing her funds.

When Plaintiff began receiving routine care at the Family Health Center at Community Medical Center on September 3, 2010, she had not taken any medications since January 2010. Her blood pressure was uncontrolled; the batteries in her blood glucose monitor were dead. When Plaintiff returned on December 10, 2010, Dr. Vang noted that Plaintiff had not taken her medications for over one year.

Agency physician H. Amado, M.D., completed the psychiatric review technique on October 14, 2010. Dr. Amado characterized Plaintiff as having affective disorders and anxiety-related disorders, with co-existing physical impairments. Her affective disorder did not fit the existing categories set forth on the form, diagnosed as either bipolar affective disorder or, per the consultative examiner, mood disorder not otherwise specified. Plaintiff's diagnosis of anxiety not otherwise specified had been established in the April 2008 hearing decision. Dr. Amado opined that Plaintiff had mild restriction of activities of daily living and in maintaining social functioning; moderate

///

limitations in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. He noted:

> After reviewing the evidence on file, would suggest [mental residual functional capacity] for unskilled work activity with physical issues to the side, applying Chavez AR and thereby adopting the ALJ['s] decision of 4/08 with no apparent material changes in circumstances noted. The psych[iatric consulting examiner] diagnosed a mood disorder as opposed to Anxiety NOS per ALJ, but the latter had been aware of the mood swings reported, not a newly discovered impairment since the time of ALJ decision in 4/08. The current [consulting examiner] offered an adverse [medical source statement] that is not given great weight—Chavez AR aside for the moment—as it seems disproportionately restrictive compared to the MSE findings and functional information on file. Mental allegations are partially supported.

AR 277.

Dr. Amado opined that Plaintiff was moderately limited in the ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. He acknowledged that these impairments might be construed to signify that Plaintiff was unable to be employed gainfully, but that these were the same impairments with which the 2008 hearing decision had concluded she was able to work.

When Plaintiff returned to the Family Health Center on September 20, 2011, she had taken no medications since April 2011. Plaintiff claimed that she had been off her diabetes medications since 2009 following weight loss. Although Plaintiff complained of burning during urination, tests for a urinary tract infection were negative. Blood pressure was at goal. Dr. Vang referred Plaintiff for dental care. On December 15, 2011, dental surgeon Kho Choy noted that tooth #31 was decayed to the pulp and gum line, and extracted the tooth.

///

**Vocational expert testimony.** Vocational expert Jose Chaparro testified that Plaintiff had no past relevant work. For all hypothetical questions, the ALJ directed Chaparro to assume a hypothetical person of the same age, education, language, experience, and background as Plaintiff.

For the first hypothetical question, the ALJ directed Chaparro to assume an individual with no standing or walking limitations, who could lift and carry fifty pounds occasionally and 25 pounds frequently; could not climb or balance; had no manipulative limitations; and should not work around heights or heavy machinery. Chaparro opined that the hypothetical person could perform the jobs of bagger, retail trade, (medium, unskilled, DOT No. 920.687-014) with approximately 153,000 jobs nationally and 21,000 jobs in California; hand packager (medium, unskilled, DOT No. 920.587-018) with approximately 54,500 jobs nationally and 7000 to 7300 in California; or hospital cleaner (medium, unskilled, DOT No. 323.687-010) with 69,000 jobs nationally and 7200 jobs in California.

For the second hypothetical question, the ALJ directed Chaparro to assume a hypothetical person, who was moderately limited in the ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to maintain regular attendance and be punctual; complete a normal work day or work week; work in coordination and proximity to others; and respond appropriately to changes in work setting. The individual is not precluded from unskilled, entry level work on a sustained basis. Chaparro opined that the second hypothetical person could perform "the world of unskilled work" so that the grids would apply.

For the third hypothetical question, the ALJ directed Chaparro to assume a hypothetical person who is not capable of handling her own funds; has fair ability to understand and remember detailed instructions, to maintain attention and concentration, to accept instruction from supervisors, and to deal with various changes; has poor ability to sustain normal routine without supervision, and to complete a regular workday or workweek; has good ability to understand, remember and carry out short and simple instructions; and has a fair likelihood of emotional deterioration in the work environment. Chaparro opined that no jobs would be available for the third hypothetical person.

9

For the fourth hypothetical question, the ALJ directed Chaparro to assume a hypothetical person, who could lift and carry 20 pounds; could sit twenty minutes at a time; could walk two hours at a time; concentrate twenty minutes at a time; and needed one unscheduled one-hour break per day. According to Chaparro, no work would be available for the fourth hypothetical person.

**III.     Discussion**

**A.     Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

**B.     Legal Standards**

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. See 42 U.S.C. § 423(d)(2)(A); *Tackett v. Apfel*,  180 F.3d 1094, 1098 (9th Cir. 1999).  A claimant

10

must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Id.*

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520; 416.920. The process requires consideration of the following questions:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995). If a claimant is found "disabled" or "not disabled" at any step, the remaining steps need not be addressed. *Tackett*, 180 F.3d at 1098.

At steps one through four, the claimant bears the burden of proof, subject to the presumed non-adversarial nature of Social Security hearings and the Commissioner's affirmative duty to assist claimants in developing the record whether or not they are represented by counsel. *Tackett*, 180 F.3d at 1098 n. 3; *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). If the first four steps are adequately proven, the burden shifts to the Commissioner to prove at step five that considering the claimant's residual functional capacity, age, education, and work experience, he or she can perform other work that is available in significant numbers. *Tackett*, 180 F.3d at 1098; *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of March 1, 2010.  Her severe impairments were anxiety disorder and knee pain.  Neither of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1 (416.920(d), 416.925, and 416.926).  Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c), except that she is limited to performing simple, repetitive tasks but can maintain adequate concentration, persistence, and pace for simple tasking.  She is capable of dealing with routine changes in the work place and appropriately interacting with others.  Plaintiff had no past relevant work.  Nonetheless, considering Plaintiff's age, education, work experience, and residual functional capacity, she could perform other jobs that exist in significant numbers in the national economy.

### C. Plaintiff's Credibility

Remembering Plaintiff's consistent lack of credibility before analyzing her substantive claims is imperative in this case.  Citing her dismal work history, history of unreported income, and a "very wide range of activities of daily living " that were inconsistent with her claims of disability, the ALJ found Plaintiff's credibility to be "*quite* poor."  AR 27.  His assessment was consistent with Dr. Wagner's observation that Plaintiff was a poor historian, as illustrated by multiple representations that could not be documented or were demonstrably untrue, and with Ms. Pritchett's representation of her mother as a hypochondriac who would feign illness to avoid challenging or undesirable situations.

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of

credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen*, 80 F.3d at 1273. If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

Reviewing a cold record, the Court cannot be certain whether Plaintiff's many misrepresentations and exaggerations are attempts to manipulate the outcome of her disability claim or symptoms of the mental impairment. Resolving that question is not required. Medical treatment necessarily relies on the patient's account of his or her physical or mental condition, specific symptoms, effects of medications and other treatment, and such. Although Plaintiff certainly possesses multiple serious impairments, her medical records are replete with inconsistencies, patent exaggerations, and questionable representations that complicate a fact finder's attempts to identify the truth, especially within the limits of an administrative proceeding such as one evaluating a claimant's application for disability benefits. As the ALJ concluded, the opinions of Plaintiff's physicians must be carefully evaluated in light of Plaintiff's limited credibility.

### D.     Doctors' Opinions and the Presumption of Non-Disability

Since Dr. Amado was a non-examining physician, Plaintiff contends that the ALJ erred in rejecting the opinion of Dr. Gauch, who examined Plaintiff. Pointing out that Plaintiff totally ignores the presumption of non-disability that applies in this case, the Commissioner responds that the ALJ appropriately applied Dr. Amado's opinion in the course of determining whether Plaintiff established changed circumstances. The Court agrees with the Commissioner. When an applicant has one or more previous denials of applications for disability benefits, as Plaintiff has in this case, he or she must overcome a presumption of non-disability.

The principles of *res judicata* apply to administrative decisions, although the doctrine is less rigidly applied to administrative proceedings than in court. *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988); *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988). Social Security Ruling ("SSR") 96-4(9), adopting *Chavez*, applies to cases involving a subsequent disability claim with an unadjudicated period arising under the same title of the Social Security Act as a prior claim in which there has been a final administrative decision that the claimant is not disabled. A previous final determination of non-disability creates a presumption of continuing non-disability in the unadjudicated period. *Lester*, 81 F.3d at 827.

The presumption may be overcome by a showing of changed circumstances, such as new and material changes to the claimant's RFC, age, education, or work experience. *Id.* at 827-28; *Chavez*, 844 F.2d at 693. In evaluating the new application, the ALJ must first determine whether changed circumstances exist that prevent a finding of continuing non-disability. *Scott v. Colvin*, 2014 WL 3797491 at * 15 (S.D.Cal. Aug. 1, 2014) (No. 13-CV-1189 W(DHB)). If changed circumstances exist, the prior residual functional capacity is still entitled to res judicata. *Id.* The ALJ must then determine whether new and material evidence exists that could support a finding that the plaintiff's residual functional capacity had changed. *Id.*

"*Chavez* explicitly states that a claimant must prove 'changed circumstances' *indicating greater disability*." *Bose v. Astrue*, 2011 WL 1211601 at * 9 (D.Ariz. Mar. 31, 2011) (No. CV 09-02257-PHX-MHM). Thus, Plaintiff needed to prove both changed circumstances and that those changes resulted in greater disability. *Id.* at *10. Plaintiff does not argue, however, that the Dr. Gauch's opinion supported a finding of either changed circumstances or greater disability. In fact, as the Commissioner points out, Plaintiff does not address the presumption of non-disability in any way.

The ALJ began his analysis by stating: "The Disability Determination Service psychiatric consultant, Dr. Amado, imposed limits that would likely preclude substantial gainful activity, but as

14

noted by the Disability Determination Service, there is no material change in the claimant's psychiatric condition from the April 2008 Administrative Law Judge decision.  AR 26 (*citations to record omitted*).[11]  The ALJ added that, in any event, the Disability Determination Service evaluators concluded that Plaintiff remained capable of unskilled, entry-level employment despite various continued limitations.

Since Dr. Gauch did not address whether Plaintiff's circumstances had changed, her opinion had little direct relevance to the changed-circumstances analysis.  Because Plaintiff failed to establish changed circumstances sufficient to overcome the presumption of non-disability, neither the ALJ nor this Court need examine her opinion of Plaintiff's limitations or the vocational examiner's opinion of the employability of a person with Plaintiff's limitations.  Without changed circumstances, the Court must presume non-disability.

### D. Ms. Pritchett's Third-Party Opinion

Plaintiff contends that the ALJ erred in giving little weight to the opinion of her daughter, Ms. Pritchett.  In the absence of changed circumstances, Ms. Pritchett's report of her mother's functioning has little relevance.  In any event, the ALJ adequately explained his reasons for giving substantial weight to some portions of Ms. Pritchett's report and little weight to others.

"Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account, unless he ultimately determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th

---

[11] The Court is puzzled by the ALJ's repeated statements that *Chavez* does not apply directly to Title XVI claims.  That the presumption of nondisability applies in successive Title XVI cases is settled law.  Pursuant to *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985), "[w]hen a claimant's application for SSI benefits is denied and the claimant does not appeal, the decision denying benefits becomes binding on all parties and creates a presumption of continuing nondisability."  *Cabe v. Barnhart*, 168 Fed.Appx. 180, 181 (9th Cir. 2006).  To prevail, "in a subsequent application for SSI based on the same disability, the claimant 'must prove 'changed circumstances' indicating a greater disability."  *Id.* (quoting *Chavez,* 844 F.2d at 693).  "Because [the claimant] applied for SSI on May 8, 1998, and was denied, under res judicata, the ALJ must respect the decision of previous courts unless there are 'changed circumstances' since the last request for SSI."  *Winters v. Barnhart*, 2003 WL 22384784 at * 5 (N.D. Cal. Oct. 15, 2003) (No. C 02-5171 SI) (citing *Chavez*).  *See also, for example*, *Fenton v. Comm'r of Soc. Sec.*, 2014 WL 3891640 at * 4 (D. Ore. August 6, 2014) (No. 3:13-cv-01455-HZ); *Chunglo-Stewart v. Colvin*, 2014 WL 3846121 at * 4 (W.D. Wash. August 5, 2014) (No. C13-1872-JCC); *McAfee v. Colvin*, 2013 WL 4008746 at * 1 (C.D. Cal. August 5, 2013) (ED CV 12-01630-VBK); *Ingram v. Astrue*, 2010 WL 4392796 at *1 (E.D. Cal. Oct. 29, 2010) (No. 1:08-cv-2829-GGH); *Moua v. Astrue*, 2010 WL 1340853 at * 4 (E.D. Cal. March 31, 2010) (No. 1:08-cv-01941-DAD); *Olivas v. Astrue*, 2009 WL 2163522 at * 2 (C.D. Cal. July 16, 2009) (No. SACV 08-01085-MLG).

Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). Friends and family members who are in a position to observe the claimant's symptoms and daily activities are competent to testify about their observations of the claimant's condition. *Dodrill*, 12 F.3d at 918-19. An ALJ's disregard of the testimony of friends and family members violates the regulations, which provide for consideration of the observations of non-medical sources regarding the effects of the claimant's impairments on his ability to work. *Id., citing* 20 C.F.R. § 404.1513(e)(2).[12] *See also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). When a claimant alleges symptoms that are not supported by medical evidence in the record, the agency directs the adjudicator to obtain information about those symptoms from third parties likely to have such knowledge. SSR 88-13. The ALJ must give "full consideration" to such testimony. *Id.*

The ALJ gave significant weight to Ms. Pritchett's detailed statements regarding Plaintiff's activities of daily living, but rejected Ms. Pritchett's statements regarding Plaintiff's physical functions as (1) vague and unquantifiable, and (2) inconsistent with Dr. Wagner's findings and conclusions. He was not required to do more.

### III. Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated: **April 15, 2015**          **/s/ Sandra M. Snyder**
                                    UNITED STATES MAGISTRATE JUDGE

---

[12] The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

17